THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MAURICE COLEMAN *et al.*, Defendants-Appellants.

First District (5th Division) No. 83—1569

Opinion filed February 3, 1989.—Rehearing denied March 2, 1989.

414

Steven Clark and Patricia Unsinn, both of State Appellate Defender's Office, of Chicago, for appellants.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Mary Ellen Dienes, and Phillip J. Bartolementi, Assistant State's Attorneys, of counsel), for the People.

JUSTICE PINCHAM delivered the opinion of the court:

A jury found the defendants, Maurice Coleman and Joseph Barnes, guilty of the August 2, 1981, armed robbery and murder of Terrell Jackson. Both defendants were sentenced to imprisonment for 30 years for the armed robbery and to natural life for the murder. Both defendants appeal.

The issues presented for review are: (1) whether the trial court erred in overruling the defendants' motion to suppress and in admitting evidence of their lineup identifications; (2) whether the death qualification of the jury for the innocence-guilt phase of the case violated the defendants' right to an impartial jury representative of a fair cross-section of the community, guaranteed by the sixth and fourteenth amendments to the Constitution of the United States; (3) whether the defendant Barnes was denied due process by the prosecutor's failure, in violation of the discovery rules, to timely reveal the existence and contents of, and the witnesses to, a statement made by the defendant Barnes; (4) whether the prosecutor's closing argument was improper and denied the defendants due process; and (5) whether during deliberation the trial court erred in denying the jury's request for a trial transcript of a witness' trial testimony.

The trial testimony presented by the State revealed the following facts of the robbery-murder.

On Sunday, August 2, 1981, at about 5 p.m., the deceased, Terrell Jackson, age 33, was enjoying the peace and tranquility of his home, where he lived with his wife and five children on the south side of

Chicago. He fell asleep on the floor while watching television in the second-floor bedroom. Jackson's young brother, Arlander Adamson, age 18, was watching television in the first-floor living room of the residence. Jackson's stepdaughter, Gwen Thomas, age 19, was in a second-floor bedroom with her baby, either watching television or sleeping.

Two men burst through the rear door of the premises. Each man had a gun in his hand. The men put their guns to Adamson's head and commanded Adamson to tell them who else was in the house. Adamson told them that his brother, his niece and her baby were upstairs and that no one was in the basement. One of the men checked the basement because a radio was playing there. The two men asked Adamson if there were any drugs or money in the house. One of the men suggested that they should kill Adamson. The other man disagreed. The two men bound and gagged Adamson and forced Adamson to accompany them upstairs.

Adamson indicated to the two men that his niece and her baby were in the room where the door was closed. The men with Adamson went down the hallway to the room of Terrell Jackson, who was asleep on the floor with the television playing. The men ordered Adamson to lie on the floor and Adamson did so. The men told Jackson to get up and asked him, "Where is the s--t at?" As Jackson awakened, the two men fired six shots into Jackson's body. One of the men took Jackson's jewelry and money and the other looked through various drawers in the room while asking, "Where's the s--t?"

One of the men left the room and went to the room of Gwen Thomas, and with the gun in his hand, the man told Gwen Thomas to come with him. The man directed Gwen Thomas to her father's, Jackson's room, which was only about eight or nine feet away. Gwen Thomas saw Jackson lying on the floor, shot, and Adamson was lying beside him.

One of the men told Gwen Thomas that if she didn't tell them where "it" was, the two men would kill them all. Gwen Thomas asked Jackson what the men wanted and where "it" was. Jackson said that he didn't have anything and that he did not want to die. The two men ransacked the room, went into the closets and under the mattress, and pulled out drawers. One of the men put something in his pocket. One of the men tied up Gwen Thomas and made her lie facedown on the floor and took a chain from around her neck. The two men left.

Thomas and Adamson untied each other. Thomas went downstairs, locked the doors and called the police, her grandmother and her cousin while Adamson held Jackson, dying in his arms. Jackson

died almost instantly from one of the six bullets which entered his right chest at a range of less than two feet, lacerated his liver, kidneys and aorta, causing massive internal bleeding.

Arlander Adamson and Gwen Thomas gave the police descriptions of the two offenders. Later that evening they looked through photograph books at the police station. Neither made any identification from the photographs. On August 18, 1981, Gwen Thomas looked through a book of photographs which had been brought to her home by Chicago police detectives Redmond and O'Leary. She identified a picture of defendant Maurice Coleman as a picture of one of the robbery-murder offenders. On the following day, Gwen Thomas and Arlander Adamson identified Maurice Coleman in a lineup at a Chicago police station as one of the offenders.

On August 28, 1981, Arlander Adamson was shown a group of photographs by Chicago police detectives Redmond and O'Leary and he identified the picture of the defendant Joseph Barnes as resembling the other offender. On September 6, 1981, a complaint for preliminary examination which charged Joseph Barnes with the August 2, 1981, robbery-murder of Terrell Jackson was prepared and filed by Detective O'Leary in a branch of the first municipal district of the circuit court of Cook County. The court ordered and a warrant was issued for Barnes' arrest. The detectives were unable to locate Barnes in the Chicago area. Upon notice to them, Baltimore, Maryland, police arrested Barnes in Baltimore on September 12, 1981. After extradition proceedings, Barnes was extradited to Chicago on February 17, 1982, and on that date Gwen Thomas and Arlander Adamson identified Joseph Barnes in a lineup as the other offender who invaded their home and robbed and killed Terrell Jackson on August 2, 1981. Adamson and Thomas also identified Coleman and Barnes at trial as the two assailants who intruded into their home, robbed them and killed Terrell Jackson.

## I

Both defendants now claim for reversal in this court that they were denied their sixth amendment constitutional right to counsel at their lineups and the trial court therefore erred in denying their motions to suppress their lineup identifications. Conversely, the State maintains that both defendants waived their right to counsel at their lineups, that neither defendant presented or preserved the right to counsel issue in the trial court and both defendants therefore waived the issue in the trial court and in this court.

Defendant Maurice Coleman's major basis in his pretrial lineup

identification suppression motion was that his lineup identification was suggestive.[1] After alleging suggestive photograph identifications by the witnesses and that he was arrested and placed in a lineup, which he characterized as a "witness-suspect confrontation," Coleman's motion to suppress his lineup identification then alleged that *"prior to said confrontation the accused was not advised by the police that he had a right to have an attorney present during such confrontation."* (Emphasis added.) Likewise defendant Joseph Barnes' main assertion in his lineup identification suppression motion was that his lineup identification was also suggestive.[2] Barnes' motion alleged that he was arrested, that the witnesses were suggestively shown photographs, that "on February 17, 1982, Joseph Barnes stood in a five man lineup," and *"that prior to said confrontation the accused was not advised by the police that he had a right to have an attorney present during such confrontation."* (Emphasis added.)

The defendants' motions to suppress their lineup identifications were consolidated for an evidentiary hearing, at which neither defendant testified. Defendant Coleman's attorney called Gwen Thomas as a witness on the hearing and elicited from her the following testimony.

On August 2, 1981, she lived at 6856 S. Calumet with her father, Terrell Jackson, the deceased, and on that date she went to a police station where police officers showed her photographs in a pile of books for about 1½ hours. On August 18, 1981, police officers came to the home of a friend of Gwen Thomas, where she was visiting, and showed her eight photographs, which she identified in court. She identified photograph "two D" in court as the photograph she identified when she was shown them on August 18, 1981, and told the officers that she recognized the picture. On the following day, August 19, 1981, Chicago police officers returned and showed her another book of photographs and she identified a picture in the book as a picture of one of the persons she saw in her house on August 2, 1981. Later, on August 19, at about two or three o'clock in the afternoon, at a police station she viewed a lineup, from which she identified number three.

Upon concluding her direct examination by Coleman's attorney, as above set forth, Gwen Thomas was then questioned by the attorney for the defendant Joseph Barnes, who elicited from her the following testimony.

---

[1]The complete text of defendant Maurice Coleman's "Motion to Suppress Identification Testimony" is set forth as Appendix I.

[2]The complete text of defendant Joseph Barnes' "Motion to Suppress Identification Testimony" is set forth as Appendix II.

On August 28, 1981, she saw some photographs while she was at a friend's home. Barnes' attorney showed her a group of photographs, defendants' group exhibit No. 2, and Gwen Thomas identified them as the photographs she saw August 28, 1981, and from which she singled out the photograph marked "D" as resembling one of the men that had been in her apartment. On February 2, 1982, she viewed a lineup. Before she looked at the photographs she had given a description of the two men who had been in her home to the police officer. Thomas was asked by Barnes' attorney how many people she had described, to which the prosecutor objected. Gwen Thomas was excused from the courtroom while Barnes' attorney argued to the trial court the validity of the question. The argument he presented was that the lineup was suggestive. The trial court overruled the prosecutor's objection, and when Gwen Thomas resumed the witness stand, Barnes' attorney further elicited from her the following testimony.

Before she saw the photograph, she gave a description to the police officers of the two men who had come into her home. The descriptions that she gave were, "One was light, tall and slim with a cap on and blue jeans and a blue track jacket. The other one was dark, bigger, a beard, blue jeans, about a hundred and thirty five, forty pounds." On February 17, 1982, Thomas viewed a lineup, and Barnes' exhibit No. 4 was a picture of that five-man lineup. From left to right, number one picture of the persons in the lineup was a person whose photograph the officers previously showed her.

Gwen Thomas then testified on cross-examination by the prosecutor that when she was shown the book of photographs she identified the photograph of the defendant, Maurice Coleman, and on the next day, August 19, 1981, she identified Coleman in a lineup at a police station. Some days later, she saw a group of photographs which contained a photograph of the defendant Joseph Barnes, whom she thereafter, on February 17, 1982, identified in a lineup.

Arlander Adamson was then called on the hearing of the defendant's motions to suppress identification by defendant Coleman's attorney and he testified as follows.

On August 2, 1981, he was visiting his brother, Terrell Jackson, the deceased, in his home at 6856 South Calumet Avenue and after the incident took place in Jackson's home, he went to a police station where he was shown four or five books of photographs. He did not identify anyone in the photograph books. Adamson went to a police station again on August 19, 1981, and looked at photographs and viewed a lineup. He had previously given the police officers a description of the two individuals that he thought were responsible for the

August 2, 1981, robbery-murder of his brother in his house. Adamson told the officers that one of the individuals was approximately 5 feet 4 to 5 feet 6 inches tall, weighed about 140 to 145 pounds and had a full beard and a full mustache. Defendants' exhibit No. 3 was a photograph of the lineup he saw on August 19, 1981, about 4 p.m., and in the photograph he identified number three.

Arlander Adamson was then questioned by the attorney for Joseph Barnes and testified: He was shown about six photographs on August 28, 1981, by police officers. He had previously given the officers a description of the other person as being between 5 feet 10 inches and 6 feet tall, weighing about 140 to 150 pounds, having a thin build, light complexion, a small mustache, wearing black-rimmed sunglasses, a black tam, blue track suit jacket with white stripes and blue jeans. Defendants' group exhibit No. 2 was the photographs he was shown on August 28, 1981, and he picked out photograph "D" as resembling one of the offenders.

Adamson further related that on February 17, 1982, he viewed a lineup and defendants' exhibit No. 4 was a photograph of the five-man lineup.

On cross-examination by the prosecutor, Arlander Adamson testified that when he told the officers that photograph "D" of defendants' group exhibit No. 2 resembled one of the offenders, he also told the officers that he would like to see a lineup in order to be certain. The defendant Joseph Barnes' picture was in the February 19, 1982, lineup photograph.

The attorney for defendant Maurice Coleman then called a Chicago police department detective, James O'Leary, who testified that he was at the August 19, 1981, lineup involving the shooting death of Terrell Jackson, which lineup was viewed by Arlander Adamson and Gwen Thomas. Defendants' exhibit No. 3 was a photograph of that lineup. Coleman, who appears in the lineup photograph, was arrested on August 19, 1981, at 2:45 p.m., pursuant to a warrant which charged him with the murder of Terrell Jackson. The lineup was at 5:30 p.m.

The attorney for defendant Maurice Coleman next called Detective James Redmond as a witness, and he testified that he was present on August 18, 1981, when Gwen Thomas viewed a Chicago police mug book.

Detective Redmond testified on direct examination by the attorney for defendant Joseph Barnes that he conducted a lineup on February 17, 1982, and that defendant Joseph Barnes was one of the five people in that lineup. Gwen Thomas and Arlander Adamson had given

Detective Redmond descriptions of the offenders involved in the incident before they viewed the lineup.

Coleman and Barnes rested on the evidentiary hearing of their motions to suppress their lineup identifications. They now urge that they were denied their constitutional right to counsel at their lineups. Other pertinent evidence presented on the hearing is hereafter set forth and discussed.

 The right to counsel is provided in the sixth amendment to the Constitution of the United States and is binding upon the States by the fourteenth amendment. (*Gideon v. Wainwright* (1963), 372 U.S. 335, 342, 9 L. Ed. 2d 799, 804, 83 S. Ct. 792, 795.) The sixth amendment provides that, "In all criminal prosecutions, the accused shall enjoy the right *** to have the Assistance of Counsel for his defense." (U.S. Const., amend. VI.) Article I, section 8, of the Illinois Constitution similarly provides that, "In criminal prosecutions, the accused shall have the right to appear and defend in person and by counsel; ***." (Ill. Const. 1970, art. I, §8.) Under these aforementioned constitutional guarantees, a defendant has a right to counsel at all critical stages of the criminal proceedings against him. (*United States v. Wade* (1967), 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926.) A critical stage of a criminal proceeding is when criminal charges have been brought in a judicial tribunal against a defendant, entitling the defendant to his constitutional right to counsel. (*Kirby v. Illinois* (1972), 406 U.S. 682, 32 L. Ed. 2d 411, 92 S. Ct. 1877.) Adversary judicial criminal proceedings are initiated by the filing of a complaint for examination which charges an accused with the commission of a criminal offense and is a critical stage of the criminal proceeding at and during which the accused has a constitutional right to counsel. *Moore v. Illinois* (1977), 434 U.S. 220, 228, 54 L. Ed. 2d 424, 433, 98 S. Ct. 458, 464.

In *Moore*, the rape victim was escorted by a police officer to court, where she signed a complaint for preliminary examination which charged defendant Moore with the rape offense. When the defendant was later that day called before the court without counsel to answer the charge, the rape victim identified him as her assailant. The defendant was later indicted. His pretrial motion to suppress the victim's aforesaid identification of him as her assailant, on the ground that his sixth amendment right to counsel was violated by the identification because of the absence of his counsel, was overruled. The defendant was convicted and the supreme court of Illinois affirmed. In reversing, the Supreme Court of the United States held:

"In *Kirby v. Illinois*, 406 U.S. 682 (1972), the plurality opin-

ion made clear that the right to counsel announced in *Wade* and *Gilbert* attaches only to corporeal identifications conducted 'at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.' 406 U.S., at 689. This is so because the initiation of such proceedings 'marks the commencement of the "criminal prosecutions" to which alone the explicit guarantees of the Sixth Amendment are applicable.' *Id.*, at 690. Thus, in *Kirby* the plurality held that the prosecution's evidence of a robbery victim's one-on-one stationhouse identification of an uncounseled suspect shortly after the suspect's arrest was admissible because adversary judicial criminal proceedings had not yet been initiated.

\* \* \*

\*\*\* [The Court of Appeals] read *Kirby* as holding that evidence of a corporeal identification conducted in the absence of defense counsel must be excluded only if the identification is made after the defendant is *indicted*. [Citation.] Such a reading cannot be squared with *Kirby* itself, which held that *an accused's rights under Wade and Gilbert attach* to identifications conducted '*at or after the initiation of adversary judicial criminal proceedings,' including proceedings instituted 'by way of formal charge* [or] preliminary hearing.' 406 U.S., at 689. *The prosecution in this case was commenced under Illinois law when the victim's complaint was filed in court.* See Ill. Rev. Stat., ch. 38, §111 (1975).

\* \* \*

\*\*\**Here, \*\*\* petitioner's Sixth Amendment rights were violated by a corporeal identification conducted after the initiation of adversary judicial criminal proceedings and in the absence of counsel.*" (Emphasis added.) *Moore v. Illinois* (1977), 434 U.S. at 226-28, 231, 54 L. Ed. 2d at 432-33, 35, 98 S. Ct. at 463-64, 466.

The purpose of defense counsel's presence at a defendant's lineup after the initiation of adversary judicial criminal proceedings was defined in *United States v. Wade* (1967), 388 U.S. 218, 230-32, 234-36, 241, 18 L. Ed. 2d 1149, 1159-60, 1162, 1165, 87 S. Ct. 1926, 1934-35, 1936-37, 1939, as follows:

"[T]here is serious difficulty in depicting what transpires at lineups and other forms of identification confrontations. \*\*\* [The defendant] can seldom reconstruct the manner and mode of lineup identification for judge or jury at trial. \*\*\* [N]either

witnesses nor lineup participants are apt to be alert for conditions prejudicial to the suspect. *** [N]either witnesses nor lineup participants are likely to be schooled in the detection of suggestive influences. Improper influences [at the lineup] may go undetected by a suspect ***. Even when he does observe abuse, *** [the defendant] may be reluctant to take the stand ***. *** [A]ny protestations by the suspect of the fairness of the lineup made at trial are likely to be in vain; the jury's choice is between the accused's unsupported version and that of the police officers present. *** [T]he accused's inability effectively to reconstruct at trial any unfairness that occurred at the lineup may deprive him of his only opportunity meaningfully to attack the credibility of the witness' courtroom identification.

\* \* \*

The few cases that have surfaced therefore reveal the existence of a process attended with hazards of serious unfairness to the criminal accused and strongly suggest the plight of the more numerous defendants who are unable to ferret out suggestive influences in the secrecy of the confrontation.

\* \* \*

*** [T]here is grave potential for prejudice, intentional or not, in pretrial lineup, which may not be capable of reconstruction at trial, and [the] presence of counsel itself can often avert prejudice and assure a meaningful confrontation at trial ***.

\* \* \*

*** [C]ounsel's presence at the lineup would equip him to attack not only the lineup identification but the courtroom identification as well ***."

In *People v. Marshall* (1977), 47 Ill. App. 3d 784, 786, 365 N.E.2d 367, this court held:

"Defendant initially contends that the trial court erred in denying his motion to suppress the lineup identifications because such identifications were effected after a charge had been placed against the defendant and at a time when the defendant was not represented by counsel. The record reveals that on January 30, 1973, defendant was arrested and identified in a lineup and that during this lineup defendant was not represented by counsel. Approximately one week before this lineup, a complaint for preliminary examination' charging defendant with armed robbery and an arrest warrant had been issued.

In *Kirby v. Illinois* [citation], the United State Supreme

Court held that the requirement of presence of counsel at a lineup extends to any 'adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.' Relying on *Kirby*, this court in *People v. Hinton* [citation], held that the *issuance of a complaint followed by an arrest warrant and the actual arrest of the defendant was a 'formal charge' within the purview of Kirby and required the presence of counsel at the lineup. We similarly believe, in the instant case, at the time of the lineup adverse judicial proceedings had begun and that defendant should have been afforded counsel.*" (Emphasis added.)

■ The supreme court of Illinois held in *People v. Curtis* (1986), 113 Ill. 2d 136, 143, 497 N.E.2d 1004, that "[a] lineup which is held after the initiation of 'adversary judicial criminal proceedings' without the presence of counsel for the accused is unconstitutional. [Citation.] Once it has been determined *** that a lineup violates the sixth amendment right to counsel, any evidence adduced by the prosecution that a witness identified the defendant at the lineup is subject to a *per se* rule of exclusion. [Citations.]"

"A *per se* rule excluding testimony that the accused was identified at an uncounseled lineup may be the only effective sanction to assure that law enforcement authorities will respect the accused's constitutional right to the presence of his counsel at the critical lineup." *Gilbert v. California* (1967), 388 U.S. 263, 273, 18 L. Ed. 2d 1178, 1186, 87 S. Ct. 1951, 1957.

"The right to counsel attaches upon the filing of a criminal complaint or information and the issuance of an arrest warrant." (*People v. Jumper* (1983), 113 Ill. App. 3d 346, 349, 447 N.E.2d 531.) "After Faulkner was charged by complaint with rape, he was entitled to counsel. [Citations.] Testimony regarding a lineup identification in violation of that entitlement is prohibited ***. Therefore, defendant's motion to suppress such testimony should have been granted." (*People v. Faulkner* (1980), 86 Ill. App. 3d 136, 139, 407 N.E.2d 126.) "The law is clear that with the filing of the complaint charging Giovannetti with murder, defendant was entitled to counsel, a point which the State concedes ***." *People v. Giovannetti* (1979), 70 Ill. App. 3d 275, 282, 387 N.E.2d 1071.

■ On the evidentiary hearing of the motions to suppress the lineup identification in the case at bar, it was the uncontradicted testimony of Detective O'Leary that on August 19, 1981, the defendant Maurice Coleman was arrested on a warrant "charging him with the offense of murder in connection with the death of Terrell Jackson."

The record before us discloses that the warrant for the arrest of Coleman was based on a complaint for preliminary examination subscribed and sworn to on August 19, 1981, by Chicago police officer Daniel Oravetz. The complaint alleged that "Maurice Coleman on August 2, 1981, at 6856 South Calumet Avenue, Chicago, Illinois, committed the offense of murder, in that he killed Terrell Jackson without lawful justification by shooting him with a gun ***." The record also reveals that the judge before whom the complaint was presented examined the complaint and the officer who presented it, heard evidence thereon, and was satisfied that there was probable cause for filing the complaint, granted leave to file the complaint and issued the warrant for Coleman's arrest. Adversary judicial criminal proceedings, a critical stage of the proceedings, were thereby commenced, which, under the foregoing authorities, thereby entitled Coleman to his constitutional right to counsel upon arrest in execution of the warrant and upon being placed in a lineup, charged with, and viewed by witnesses to the Terrell Jackson murder.

Although defendant Barnes' motion to suppress his lineup identification alleged that, "Prior to said [February 17, 1982, lineup] confrontation the accused [Joseph Barnes] was not advised by the police that he had a right to have an attorney present during said confrontation," Barnes did not present any evidence on the suppression hearing to support this allegation or to support the contention that he now makes before this court that his constitutional right to counsel at his lineup was violated. The sole thrust of the evidence presented by Barnes on the suppression hearing, exclusively through his counsel's direct examination of the robbery-murder witnesses, Gwen Thomas and Arlander Adamson, and the investigating detectives, O'Leary and Redmond, who also conducted Barnes' lineup, was that his lineup identification was suggestive.

Even though defendant Barnes presented no evidence of the circumstances of his arrest on the hearing of his motion to suppress his lineup identification, the record nevertheless discloses that on September 6, 1981, Detective O'Leary subscribed and swore to a complaint for preliminary examination which alleged that on August 2, 1981, Joseph Barnes at 6856 South Calumet Avenue, Chicago, Illinois, committed the offense of murder, in that he, without lawful justification, shot and killed Terrell Jackson. The record further discloses that Detective O'Leary presented the complaint to a judge who examined him and the complaint, heard evidence thereon, found that there was probable cause for filing the complaint and ordered the filing of the complaint and the issuance of a warrant for Barnes' arrest. Barnes was arrested

in Baltimore, Maryland, on September 12, 1981, on a Governor's warrant and pursuant thereto and the extradition proceedings thereon, Barnes was extradited to Chicago on February 17, 1982, and placed in a lineup that same day.

It is clear that adversarial judicial criminal proceedings had been instituted and it was during a critical stage of the proceedings when Barnes was placed in the lineup. Barnes, too, was constitutionally entitled to a lawyer at his lineup.

Coleman and Barnes asserted in their motions to suppress their lineup identifications that the officers did not advise either of them that each of them had a right to counsel at their lineups. Coleman's identification suppression motion alleged that "various witnesses were allowed to be simultaneously present at the witness-suspect confrontation and were allowed to make their identification of the accused ***. That prior to said confrontation the accused was not advised by the police that he had a right to have an attorney present during such confrontation." Barnes' lineup identification suppression motion similarly alleged that "on February 17, 1982, Joseph Barnes stood in a five-man lineup. Prior to said confrontation the accused was not advised by the police that he had a right to have an attorney present during such confrontation."

Again, under the foregoing authorities, Coleman and Barnes each had the constitutional right to be informed of his constitutional right to counsel at the lineups. Moreover, the officers who conducted the lineups were obligated under the Federal and State constitutional right to counsel to advise each defendant of his right to counsel at the lineup and that neither of them could be required to be a participant in a lineup in the absence of his counsel, should he choose to have his counsel present.

This court recently pointed out in *People v. Bailey* (1987), 164 Ill. App. 3d 555, 572, 517 N.E.2d 570, that, "The sixth amendment constitutional right to counsel during the critical adversarial stage confers upon the defendant the right to *Wade* admonitions and the presence and representation of counsel at his post-indictment lineup. The functions of the defendant's attorney at the post-indictment lineup are somewhat different and appreciably more extensive than the role of the arrestee's attorney before or during custodial investigative interrogation of the arrestee by law enforcement officers." We then held:

"The Supreme Court concluded in *Wade* that the defendant's counsel's presence is a requisite for a post-indictment lineup, in the absence of an intelligent waiver of counsel by the defendant. The Supreme Court, however, did not specifically articu-

late in *Wade* the post-indictment right-to-counsel lineup admonitions that the sixth amendment requires be given a defendant. Certainly the sixth amendment, right-to-counsel *Wade* admonitions, during the critical adversary stage of the proceedings, would be no less than those required by the fifth amendment privilege against self-incrimination *Miranda* admonitions during the custodial investigative interrogation precritical adversary stage of the proceedings. The sixth amendment, right-to-counsel *Wade* admonitions seemingly would require more. *The Wade admonitions would certainly at least require that the defendant be informed of his right to the presence and representation of counsel at the lineup, that if he did not have or could not afford an attorney, an attorney would be provided him to be present and represent him at the lineup.* Further, that the presence and representation of his attorney at the lineup is to insure the fairness of the lineup and to enable his attorney to utilize any lineup unfairness for the defendant's benefit at trial, *that in the absence of his waiver of counsel, the defendant could not be compelled to participate in a lineup without his counsel being present and that the lineup would not be conducted in his counsel's absence. The Wade admonitions also require that the defendant be fully advised of the consequences of his waiver of counsel at the lineup* and that, in order for there to be a valid relinquishment of the *Wade* right to counsel, it must be voluntarily, knowingly and understandingly waived by the defendant. \* \* \*

\* \* \*

\* \* \* [O]ur research fails to reveal a case which holds that to waive the *Wade,* sixth amendment right to admonitions and to an attorney during the post-indictment lineup, critical adversarial stage, permits less than is required to waive the *Miranda,* fifth amendment privilege against self-incrimination and the attendant right to an attorney during the interrogation-investigative noncritical and nonadversarial stage. *It would seem, and for obvious reasons, that the right to an attorney expressly provided in the sixth amendment would be paramount in the post-indictment lineup critical adversarial stage. Moreover, for there to be a valid waiver of counsel, there must first be a complete admonition to the defendant of his right to counsel and the consequences of asserting or relinquishing the right* and then a knowledgeable and voluntary waiver of the right." (Emphasis added.) 164 Ill. App. 3d 555, 573-74.

The Supreme Court of the United States additionally held in *Wade* that, "[B]oth Wade *and his counsel* should have been notified of the impending lineup, and counsel's presence should have been a requisite to conduct the lineup, absent an 'intelligent waiver.'" (Emphasis added.) (388 U.S. at 237, 18 L. Ed. 2d at 1163, 87 S. Ct. at 1937.) In the case at bar, both defendants Coleman and Barnes should have been notified of their right to counsel at the lineup and their counsel's presence should likewise have been a requisite to the conduct of their lineups, absent an intelligent waiver.

■ The State contends before us that the record affirmatively establishes that defendant Maurice Coleman was properly informed of his constitutional right to counsel at his lineup and that Coleman expressly, knowingly and intelligently waived such right. The State further contends that neither defendant properly presented or preserved the issue of his constitutional right to counsel at his lineup in the trial court and that both defendants therefore waived the issue in the trial court and on review in this court.

Regarding the right to lineup counsel admonitions given defendant Coleman and his waiver of counsel, we note that on the evidentiary hearing of his motion to suppress his lineup identification, during the prosecutor's cross-examination Detective O'Leary testified that he was present on August 19, 1981, when the defendant Maurice Coleman was arrested at 65th and Eberhart, in Chicago, at which time Detective O'Leary's partner, Detective Redmond, advised Coleman of his constitutional rights. Thereupon the following colloquy occurred:

"[Defendant Coleman's Attorney]: I'll stipulate the officer read his rights at the time of arrest pursuant to *Miranda*.

[Assistant State's Attorney]: Stipulate that your defendant waived them?

[Defendant Coleman's Attorney]: If that's what he said, yes, you talked to him. I'll stipulate he advised him of his rights and he understood them."

Detective O'Leary further testified, pursuant to the prosecutor's cross-examination, that Detective Redmond also informed the defendant Maurice Coleman that he had the right to have a lawyer present during the lineup and that Coleman waived his right to an attorney at his lineup.

On redirect examination by Coleman's attorney, Detective O'Leary testified that they informed Coleman a second time at the police station that he had the right to have an attorney present during the lineup and at that time Coleman understood he could have a

lawyer present. Detective Redmond also told the defendant Coleman that if he could not afford a lawyer's presence at the lineup with him, one would be appointed for him, and that Coleman responded, "Go ahead and have your lineup. Nobody's going to identify me." Detective Redmond also testified on cross-examination by Coleman's attorney that he was present at the August 19, 1981, lineup, prior to which he advised the defendant Maurice Coleman of his rights, during which he told Coleman that he had a right to an attorney at lineup. On cross-examination by the prosecutor, Detective Redmond additionally testified that when he advised the defendant Maurice Coleman that he had a right to have an attorney present at the lineup, Coleman stated to him, "Go ahead and put me in a lineup. No one's going to pick me out anyway."

Detectives O'Leary and Redmond's testimony that Coleman was advised of his right to counsel at the lineup and that if he could not afford an attorney at the lineup, one would be appointed for him and that Coleman told the officers to go ahead and have the lineup, that "[n]obody's going to identify me," or "[n]o one's going to pick me out anyway," is uncontradicted, unrebutted and undenied. Moreover, Coleman's attorney stipulated and agreed that the officers advised Coleman "of his rights and he understood them."

On this state of the trial record, it is clear that Coleman was advised of his right to counsel at the lineup, that he understood the right and that he freely, voluntarily, knowingly and intelligently waived the right. Perhaps he anticipated that the cruel, heartless and nerve-wracking manner in which the offense was committed and the extended period of time between the date of the commission of the offenses on August 2, 1981, and the date of the lineup, February 17, 1982, would dull the witnesses' memories. If so, he gambled and he lost. The uncontroverted evidence before us establishes that he waived his constitutional right to counsel at the lineup. *People v. Purnell* (1984), 129 Ill. App. 3d 253, 256-58, 472 N.E.2d 183.

■■ ■ The State contends before us that neither Coleman nor Barnes, in the trial court, properly presented, by evidence on the suppression hearing, or preserved by their motions for a new trial, the errors of their alleged denial of their constitutional right to counsel at their lineups and that they therefore waived the error in the trial court as well as in this court.

In affirming the defendants' judgments of conviction for armed robbery in *People v. Precup* (1978), 73 Ill. 2d 7, 16, 17, 19, 382 N.E.2d 227, the supreme court held:

"[N]o reference was made to the denial of effective assistance

of counsel in the written motion for a new trial. The record contains a transcript of the argument of the motion for a new trial and no suggestion that the defendants were denied the effective assistance of counsel was made orally during the argument. Thus, as the State has pointed out in its brief, this alleged error was never raised in the trial court.

*** The general rule is that the failure by a defendant to raise an issue in the written motion constitutes a waiver and the issue cannot be urged as a ground for reversal on review. This waiver rule applies to constitutional as well as to other issues. *People v. Pickett* (1973), 54 Ill. 2d 280.

\* \* \*

We are not prepared to say that the trial court in this case committed error by not *sua sponte* interrupting the trial and taking whatever action would have been appropriate to preserve the defendants' constitutional right to counsel. It would have been entirely reasonable for a trial judge to assume that it was part of the defense's strategy to permit the police officer to testify as to the statements made by the two defendants. The interruption of this strategy may have, in itself, constituted error.

\* \* \*

*** [T]he issue was not raised by the defendants during the trial and was not called to the court's attention in the motion for a new trial. Under the well-established law of this State, the question has been waived and cannot be raised for the first time on review."

The supreme court affirmed the defendant's murder conviction and held in *People v. Carlson* (1980), 79 Ill. 2d 564, 575-77:

"Defendant now contends that there were numerous trial errors which require reversal of his convictions. We note that several of these alleged errors were not objected to by the defendant at trial. We therefore consider they have been waived.

It is fundamental to our adversarial system that counsel object at trial to errors. [Citation.] The rationale underlying this procedural requirement is based on the need for timely resolution of evidentiary questions at trial. [Citation.] Thus, we have generally held that the failure to object to the admission of evidence operates as a waiver of the right to consider the question on appeal.

\* \* \*

The failure of counsel to object at trial waives those errors

which the court can correct by sustaining an objection and admonishing the jury. Otherwise, counsel, by not giving the court the opportunity to prevent or correct error at trial, will gain the advantage of obtaining a reversal through his own failure to act, either intentionally or inadvertently."

The cases are legion which hold that a litigant's, a defendant's, or the State's failure to properly present or preserve an issue in the trial court constitutes a waiver of that issue and prohibits the issue from being raised for the first time on appeal. *People v. Jackson* (1981), 84 Ill. 2d 350, 358-60; *People v. Holloway* (1981), 86 Ill. 2d 78, 91-92; *People v. Weber* (1981), 98 Ill. App. 3d 631, 632-33, 424 N.E.2d 874; *People v. Chianakas* (1983), 114 Ill. App. 3d 496, 501-02, 448 N.E.2d 620; *People v. Franklin* (1987), 115 Ill. 2d 328, 336-37.

As previously noted, the main thrust of each defendant's pretrial motion to suppress his lineup identification was that they were suggestive. At no time during Coleman's attorney's argument at the conclusion of the evidentiary hearing, in support of the trial court's granting Coleman's lineup identification suppression motion, did his attorney assert a violation of Coleman's right to counsel at the lineup as a ground for granting the motion. He argued exclusively that the lineup was suggestive and concluded:

"I would ask the court to suppress that lineup identification and deny the in-court identification based on that lineup since it is so suggestive that it overwhelmingly prejudices the defendant [Maurice Coleman]."

Defendant Joseph Barnes' attorney then argued in support of Barnes' motion to suppress his lineup identification. He, too, exclusively argued that, "The nature and circumstances surrounding the lineup identification, are so suggestive as to make the identification at this point invalid. \*\*\* [T]he lineup in this situation was suggestive and that the identification should not be allowed to stand."

The prosecutor argued that there was no evidence presented on the hearing of the defendants' lineup identification suppression motions that the lineup identification of either defendant was suggestive. The prosecutor recited to the trial court paragraph by paragraph the allegations of defendant Barnes' petition to suppress his lineup identification, as hereafter set forth in Appendix II.

Upon stating to the trial court, from paragraph 6 of Barnes' suppression motion, that "[p]rior to said confrontation the accused was not advised by police that he had a right to have an attorney present," the prosecutor then stated, "We'd ask that that part be stricken. The defense has not inquired of the officers" on this issue.

The prosecutor concluded his argument, "There's been no indication that these defendants were deprived of their right to counsel. *** [W]e would ask that the defendant Barnes' motion to suppress identification be denied as well."

The trial court meticulously reviewed the evidence and stated that "the question arises as to whether or not the actions by the governmental officials in the case, the police officers, was conducive to irreparable mistaken identification." The trial court found "that nothing had been done by the police officers here that would be conducive to misidentification *** of defendants ***. *** [T]here's nothing that *** I would find in Coleman's motion that would require this court to suppress the out of court testimony of identification. *** Accordingly, it's the ruling of this court that the motion to suppress identification testimony on the part of Coleman and also on the part of Barnes are hereby denied."

At the pretrial hearing on the motion to suppress the lineup identification, neither defendant claimed that he had been denied his constitutional right to counsel at his lineup. Moreover, the defendants did not request that the trial court rule on any such claim and the trial court did not so rule.

Defendant Coleman's post-trial motion asserted 22 grounds for a new trial, paragraph 9 of which was concerned with the lineup identification suppression motion.[3] Paragraph 9 simply stated, "The Court erred in denying the Motion to Suppress Identification." The post-trial motion of the defendant, Joseph Barnes, for a new trial cited 38 grounds for the allowance of the motion, paragraph 3 of which addressed the ruling of the trial court on the lineup identification suppression motion.[4] Paragraph 3 of Barnes' motion for a new trial simply alleged that the "[t]rial court denied his motion to suppress identification evidence where defendant's lineup took place 6 months after the offense and the lineup was suggestive." Neither defendant Coleman nor defendant Barnes asserted in his motion for a new trial that his sixth amendment constitutional right to counsel at the lineup had been violated, and both defendants' attorneys waived, and did not present any oral argument in support of, the defendants' motions for a new trial.

The State contends that the meager assertion in Coleman's mo-

---

[3]The complete text of defendant Coleman's motion for a new trial is set forth in Appendix III.

[4]The complete text of defendant Barnes' motion for a new trial is set forth as Appendix IV.

tion for a new trial, "The Court erred in denying the Motion to Suppress Identification," did not preserve, but waived, for appellate review the issue of the alleged denial of Coleman's constitutional right to counsel at his lineup. Regarding the defendant Joseph Barnes, the State urges that Barnes did not present any evidence on the suppression hearing that he was not advised of, or that he was denied, his right to counsel at his lineup and that Barnes' meager allegations in his motion for a new trial that, the "[t]rial court denied his motion to suppress identification evidence where defendant's lineups took place 6 months after the offense and the lineup was suggestive," did not preserve and waived the issue of the alleged denial of Barnes' constitutional right to counsel at his lineup.

We conclude from the above and foregoing that the uncontradicted evidence presented on the hearing of the motion to suppress the defendants' lineup identifications establishes that defendant Coleman was properly advised of his right to counsel at his lineup and that he knowingly, intelligently, freely and voluntarily waived his right to counsel at his lineup. We further conclude that neither defendant, Coleman or Barnes, properly presented or preserved in the trial court the issue of the alleged denial of his right to counsel at his lineup and that each of them accordingly waived the issue and is precluded from raising it on review before this court. We find no error in the trial court's denial of their motion to suppress their lineup identifications. We are indeed mindful of Supreme Court Rule 615(a) (107 Ill. 2d R. 615(a)) that "plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Because of the foregoing circumstances of this case, we are not prepared to apply the plain error doctrine in this case. *People v. Jackson* (1981), 84 Ill. 2d 350, 359-60, 418 N.E.2d 739; *People v. Carlson* (1980), 79 Ill. 2d 564, 576-77; *People v. Precup* (1978), 73 Ill. 2d 7, 18-19.

## II

The defendants contend that they were denied their sixth amendment constitutional right to a jury composed of a cross-section of the community by the trial court's exclusion therefrom of all persons who were unalterably opposed to imposition of the death penalty.

Death was a possible penalty for the home armed robbery-murder offenses with which the defendants were charged. Section 9—1(b) of the Criminal Code of 1961 (Ill. Rev. Stat. 1987, ch. 38, pars. 9—1(b)(6)(a)(i), (b)(6)(c)) provided that, "A defendant who at the time of the commission of the [murder] offense has attained the age of 18 or

more and who has been found guilty of first degree murder may be sentenced to death if *** the murdered individual was killed in the course of another felony if the murdered individual was actually killed by the defendant" and the defendant killed the murdered individual intentionally and "the other felony was *** armed robbery." Section 9—1(c) (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(c)) provided that "the court *** shall instruct the jury to consider any aggravating *** factors which are relevant to the imposition of the death penalty," and that "[a]ggravating factors may include *** those factors set forth in subsection (b)." It is provided in section 9—1(d) (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(d)) that, "Where requested by the State, the court shall conduct a separate sentencing proceeding to determine the existence of factors set forth in Subsection (b) and to consider any aggravating *** factors as indicated in Subsection (c)." Section 9—1 (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(d)(1), (d)(2)(C), (d)(3)) further provided that the sentencing hearing proceeding shall be conducted: (1) "before the jury that determined the defendant's guilt; or (2) before a jury impanelled for the purpose of the proceeding if *** the court for good cause shown discharges the jury that determined the defendant's guilt; or (3) before the court alone if the defendant waives a jury for the separate proceeding." Section 9—1(g) (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(g)) provided that, "If at the separate sentencing proceeding *** there is a unanimous finding by the jury that one or more of the [aggravating] factors set forth in Subsection (b) exist, the jury shall consider aggravating and mitigating factors as instructed by the court and shall determine whether sentence of death shall be imposed. If the jury determines unanimously that there are no mitigating factors [under sections 9—1(c)(1) through (c)(5)] sufficient to preclude the imposition of the death sentence, the court shall sentence the defendant to death."

Prior to the trial on the innocence or guilt phase of the armed robbery and murder charges against them, each defendant asserted that his right to a jury at the separate sentencing hearing proceeding was constitutionally conferred by the sixth amendment to the Constitution of the United States, which guarantees that, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed ***." (U.S. Const., amend. VI.) Each defendant sought to waive jury and signed jury waivers for the separate sentencing hearing proceeding. Each signed jury waiver stated, "I, the undersigned do hereby waive jury for death penalty eligibility and sentencing as provided by law and submit the *** cause to the

court for hearing." The defendants filed and tendered to the trial court their waivers of jury on the separate sentencing hearing proceeding. The trial court rejected and declined to accept the defendants' jury waivers, denied the defendants' motion for waiver of jury at their sentencing hearing and held:

"The State has the jury at such time as the jury has returned a verdict; and if it is a verdict of guilty, they have a duty then to make a determination and only at that time as to whether or not they wish this jury to ascertain whether or not the death penalty should be imposed. They do not have to make that determination at the beginning of the trial. It is made in those cases in which there may be some qualifications for it. They have indicated they want to Witherspoon the jury. At this time that is their prerogative."

During the *voir dire* jury selection proceedings, pursuant to *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, the jurors were asked their views on the death penalty. *Witherspoon* held that a death sentence was invalid when imposed or recommended by a jury from which venire persons had been excluded for cause simply because they expressed general objection to, or conscientious or religious scruples or convictions against, the death penalty. Regarding the jurors' views on the death penalty, *Witherspoon* further held that a venire person could be excused for cause only if his or her objections to the death penalty were such that he or she would always vote against, would never vote for and were unalterably opposed to the death penalty no matter what the evidence might be. Such jury venire persons have come to be known as *"Witherspoon* excludables."

During the *voir dire* jury selection process, the record reflects that 29 venire persons were excused for cause pursuant to *Witherspoon*. The defendants argue that 7 of those 29 venire persons were able to swear that their attitudes against the death penalty would not affect their ability to fairly and impartially decide each defendant's innocence or guilt. The defendants further contend that seven additional venire persons were only unable to swear that their attitudes against the death penalty would not affect in any way their determination of either defendant's innocence or guilt. No *Witherspoon* excludable was chosen as a juror. Thus, all the jurors chosen unalterably favored the death penalty and expressed their favoritism for it. The trial court denied the defendants' requests to ask those jurors who expressed no opposition to the death penalty whether they strongly favored the death penalty or whether their favorable attitude or lack of

opposition to the death penalty would affect their ability to be fair and impartial jurors or impair their ability to fairly, impartially and justly determine the defendants' innocence or guilt. *Witherspoon*, and no other case that our research discloses, does not preclude such an appropriate inquiry by the trial court or counsel of the *"Witherspoon* includables." Such an inquiry of *Witherspoon* includables not only is appropriate but is indeed desired, if not required, for if such *Witherspoon* includables expressed an inability to be fair because of a strong unalterable favoritism of the death penalty, such *Witherspoon* includables would thereby become excludable for cause from the jury.

The *Witherspoon* jury found defendants guilty of the armed robbery and murder offenses. Both defendants waived jury at the bifurcated separate sentencing hearing proceeding. The trial court did not impose the death penalty, but rather sentenced the defendants to life imprisonment, from which there is no parole. Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1(1)(a).

The defendants complain before this court that the *"Witherspooning"* of the jury venire and the exclusion of the *Witherspoon* excludables from their jury produced a conviction-prone jury and did not represent a fair cross-section of the community, in violation of their sixth and fourteenth amendment constitutional rights to a jury composed of a fair, representative cross-section of the community.

In view of the varying prevailing views in the community regarding opposition to and favoritism of the death penalty, even as expressed by the jury venire persons in the instant case, it cannot be persuasively argued that a jury from which *Witherspoon* excludables have been excluded from the jury, or a jury composed solely of *Witherspoon* includables, represents a cross-section of the community. Such a jury is representative of only one section of the community and that is the section of the community which is unalterably in favor of the death penalty. The question is whether such a death-penalty favoring jury violates the defendants' sixth amendment constitutional right to a jury of a fair cross-section of the community.

A divided Supreme Court of the United States held that a jury composed exclusively of *Witherspoon* excludables did not violate a defendant's sixth amendment constitutional right to a jury composed of a fair representative cross-section of the community in *Lockhart v. McCree* (1986), 476 U.S. 162, 90 L. Ed. 2d 137, 106 S. Ct. 1758.

In *Lockhart*, defendant McCree was also charged with capital armed robbery-murder. The jury was *"Witherspooned"* and *Witherspoon* excludables were excluded from McCree's jury. The jury convicted McCree of capital felony murder but refused to impose the

death penalty and instead imposed life imprisonment without parole. In affirming McCree's conviction and life sentence, the Supreme Court majority held:

> "In sum, '*Witherspoon*-excludables,' \*\*\* may be excluded from jury service without contravening any of the basic objectives of the fair cross-section requirement. \*\*\* \*\*\* [W]e conclude that '*Witherspoon*-excludables' do not constitute a 'distinctive group' for fair-cross-section purposes, and hold that 'death qualification' does not violate the fair–cross-section requirement." (476 U.S. at 176-77, 90 L. Ed. 2d at 150, 106 S. Ct. at 1766.)

The dissenting justices in *Lockhart* pointed out that " 'death qualification' poses a substantial threat to the ability of a capital defendant to receive a fair trial on the issue of his guilt or innocence," and that there is "near unanimity of authority supporting respondent's claim that death qualification gives the prosecution a particular advantage in the guilt phase of capital trials \*\*\*." (476 U.S. at 185, 192, 90 L. Ed. 2d at 156, 160, 106 S. Ct. at 1771, 1774 (Marshall, Brennan, and Stevens, JJ., dissenting).) The dissenting justices further pointed out in *Lockhart* that "the exclusion of opponents of capital punishment capable of impartially determining culpability infringes a capital defendant's constitutional right to a fair and impartial jury." 476 U.S. at 198, 90 L. Ed. 2d at 163-64, 106 S. Ct. at 1777 (Marshall, Brennan, and Stevens, JJ., dissenting).

The dilemma of a defendant being forced, against his wish, to be tried by a death-penalty preferred and oriented *"Witherspooned"* jury on the innocence or guilt bifurcated phase of his trial, which the defendant considers to be advantageous to the State, when the defendant desires to waive jury on the separate penalty hearing proceeding, was rectified by the supreme court in *Delay v. Hett* (1986), 113 Ill. 2d 75. In *Hett*, the court stated and held:

> "Can the trial judge, prior to the commencement of trial in a capital case, accept a defendant's waiver of a sentencing jury; and if so, does he have the discretion to preclude the State from questioning prospective jurors on their views concerning imposition of the death penalty? We find the answers to both questions to be in the affirmative.
>
> \* \* \*
>
> \*\*\* [T]here is nothing in the capital sentencing statute or in the case law which precludes trial judges from accepting a defendant's voluntary, knowing, and intelligent waiver of the sentencing jury on the issue of guilt.

\*\*\* [W]e believe that the trial judges were exercising their judicial and discretionary authority in accepting the pretrial waivers of sentencing juries and in refusing to allow [the prosecutors] to question prospective jurors on imposition of the death penalty.

\* \* \*

\*\*\* [W]e find that a defendant charged in a capital punishment case is accorded the right to waive the jury for the separate sentencing proceeding. We hold that the trial judges were empowered under the terms of section 9—1(d)(3) to accept the waivers of a sentencing jury where, as here, they were voluntary and knowing." 113 Ill. 2d at 77, 79-80, 82.

*Hett* was decided in 1986, three years after the jury was selected and the sentences were imposed in the case at bar in 1983. *Hett*, however, was decided while the issue was presented, pending and awaiting a decision on review in the case at bar. Does *Hett* therefore apply, entitling the defendants to reversal of their judgments and sentences and to a new trial? The supreme court held "no" in *People v. Erickson* (1987), 117 Ill. 2d 271.

Preliminarily we note the supreme court's following amplification, in *Erickson*, of its *Hett v. Daley*, holding:

"We first consider whether or not the trial court is required to accept a defendant's pretrial waiver of the capital sentencing jury. We note, at the outset, that this was not the issue raised in *Hett*. The precise issue in *Hett* concerned the timing of a defendant's waiver of the capital sentencing jury under section 9—1(d)(3) of the Criminal Code of 1961 \*\*\*. In *Hett*, this court held that the statute permitted the tender of a waiver prior to the commencement of trial. We further held that the statute empowered the trial court to accept a capital defendant's pretrial waiver where the court found the waiver voluntary and knowing. The defendant in the instant case raises the next logical question but one not raised or addressed in *Hett*. That question is whether or not the trial court is required to accept a voluntary and knowing pretrial waiver.

\* \* \*

We therefore hold that, where a pretrial waiver of the sentencing jury is tendered and the court ascertains that it is voluntary and knowing, it must be accepted." 117 Ill. 2d at 287, 288.

The *Erickson* court observed that judicial opinion which announces new constitutional rules applicable to criminal cases is retro-

active to all cases pending on direct review at the time the new constitutional rule is announced and that the newly announced rule to be applied retroactively must be "of constitutional dimension." (117 Ill. 2d at 289.) These principles would compel application of *Hett* to the case at bar and reversal, if the right to a sentencing jury is a constitutional right. The *Erickson* court held, however, one justice taking no part in the case and two justices dissenting, that:

> "The right to a sentencing jury in a capital case is a statutory, not a constitutional, right.
>
> \* \* \*
>
> \*\*\* [W]e hold that *Hett* is not retroactive. Defendant is not entitled to a new trial either because he was unable to waive the sentencing jury prior to trial or because the State was allowed to query prospective jurors concerning imposition of the death penalty." 117 Ill. 2d at 289, 291-92.

Thus, although under *Hett*, the trial court in the case at bar erroneously allowed the prosecutor to *Witherspoon* the jury and improperly excluded *Witherspoon* excludables from the defendants' jury on the innocence or guilt phase of their trial, and even though the trial court also erred in rejecting the defendants' pretrial waiver of their right to a jury at the separate sentencing hearing proceeding, only because, under *Erickson, Hett* is not retroactive, the errors do not demand reversal of the defendants' convictions and sentences. *People v. Zayas* (1987), 159 Ill. App. 3d 554, 559, 510 N.E.2d 1125.

### III

The defendants contend that the trial court erred in admitting the State's rebuttal testimony to defendant Barnes' witnesses' alibi testimony. This issue arises from the trial testimony of the defendant's witnesses, presented by the defendant Barnes, that Barnes was in Chicago at 3939 South Lake Park with Margaret Jones at the time the armed robbery and murder of Terrell Jackson occurred on August 2, 1981, and the State's contrary rebuttal testimony of Baltimore, Maryland, Detective Verba that during the extradition proceedings against Barnes in Baltimore, Maryland, Barnes testified under oath that he was in Baltimore at the time of the Jackson murder.

The defendants contend that the prosecutor did not furnish defendants with Barnes' said statement and the witness thereto. The defendants contend the State thereby failed to comply with the pretrial discovery disclosure rules. The State responds that it complied with the discovery disclosure rules, and further, the defendants failed to object to the admission of the State's rebuttal testimony.

Illinois Supreme Court Rule 412 (107 Ill. 2d R. 412(a)(ii)) provides:

"[T]he State shall, upon written motion of defense counsel, disclose to defense counsel the following material and information within its possession or control:

\* \* \*

(ii) any written or recorded statements and the substance of any oral statements made by the accused or by a codefendant, and a list of witnesses to the making and acknowledgement of such statements."

Illinois Supreme Court Rules 413(d)(i) and (d)(iii) (107 Ill. 2d Rules 413(d)(i), (d)(iii)) provide that after the filing of a written motion by the State, defense counsel shall inform the State of any defenses which the defendant intends to make at trial and shall furnish the State with the names and addresses of the persons the defendant intends to call as witnesses, together with their relevant oral or written statements, and if the defendant intends to prove an alibi, the defense counsel is required to provide the State specific information of the place where the defendant maintains he was at the time of the alleged offense.

 These discovery rules require the State to disclose not only the defendants' inculpatory statements but any and all statements known to the State which have been made by the defendants. (*People v. Boucher* (1978), 62 Ill. App. 3d 436, 379 N.E.2d 339.) The State is obligated to furnish defense counsel the defendants' statements regardless of the State's intent to use them at trial (*People v. Eliason* (1983), 117 Ill. App. 3d 683, 453 N.E.2d 908), and the rules impose the duty on the State to furnish defense counsel with a defendant's statement even if made in open court (*People v. Caliendo* (1980), 84 Ill. App. 3d 987, 995-96, 405 N.E.2d 1133).

The State filed its discovery motion on March 19, 1982, in which the State requested defendant Barnes "to give written notice to the People any defenses, affirmative or non-affirmative, which the defendant [Barnes] intends to assert at trial," and "to furnish in writing to the People, the names and last known addresses of persons the defendant intends to call as witnesses."

Defendant Barnes filed his answer to the State's motion for discovery on May 18, 1982, in which he stated, "Defendant will assert all defenses consistent with his innocence including the possible following alibi: On August 2, 1981, between the hours of 5 p.m. and 6 p.m. defendant was at 3939 South Lake Park with Margaret Jones, Maria Jones, whose last known address is 8704 South Burley Street, Chi-

cago, Illinois, Alfreddie Thomas, 10 South Wabash, Theresa Wilkins." On July 21, 1982, defendant Barnes filed his "Notice of Alibi Defense," in which he stated, "Now comes the defendant [Joseph Barnes] and now notifies the State that he may assert the defense of alibi: 3939 South Lake Park at the time of the offense with Margaret Jones, Maria Jones and Michelle Jones."

As previously pointed out herein, defendant Barnes was arrested in Baltimore, Maryland. The record reflects that Barnes contested his extradition from Baltimore to Chicago and extradition proceedings were held which ordered his extradition to Chicago. We need not here decide if Barnes is charged with knowledge of his testimony and his statements during his Baltimore, Maryland, extradition proceedings. We note that on July 8, 1982, Barnes filed a "Motion for Discovery Particulars," in which Barnes stated, "Defendant [Barnes] was arrested in Maryland pursuant to a warrant issued in Illinois ***. Defendant was arrested in Maryland on September 12, 1981. He was extradited to Illinois on February 17, 1982. Defendant has not been furnished a copy of the arrest report from Maryland. Nor has he been furnished with a copy of any extradition proceeding conducted in Maryland." Defendant Barnes' said motion for discovery particulars prayed that the trial court "enter an order directing the State to furnish defendant with *** (a) any and all arrest and police reports from Baltimore, Maryland relating to defendant's arrest in the instant case; *** (c) *the report of proceedings from any and all extradition proceedings had with respect to defendants' incarceration and subsequent extradition with respect to the instant case.*" (Emphasis added.)

The State filed its answer to Barnes' "Motion for Discovery Particulars" on July 28, 1982, in which the prosecutor stated:

"1. That the Illinois arrest warrant and complaint are being tendered to counsel this date;

2. That the requisition (Governor's extradition warrant) and supporting affidavit are being tendered to counsel this date.

3. That the complete file relating to defendant's incarceration in Baltimore, Maryland, including a transcript of any extradition hearings held were requested both by phone and by mail on July 26, 1982 from Lt. Melvin P. Freeman of the Fugitive Unit of the Baltimore Police Department."

We need not, nor do we, decide what obligation, if any, the defendant and his attorney had to personally attempt to acquire the transcript of Barnes' Baltimore, Maryland, judicial extradition proceedings, which, it would appear, would have been equally available to him, and of which he was aware, as they were to the Cook County,

Illinois, prosecuting attorney. The record before us reveals that on August 31, 1982, Barnes' attorney was aware of the Baltimore, Maryland, extradition proceedings, that the transcript of the proceedings was not in the prosecutor's possession and that the prosecutor had endeavored and was then endeavoring to obtain it. The following colloquy occurred between the court and counsel on August 31, 1982:

"[BARNES' ATTORNEY]: As your Honor's aware from my previously filed motion for discovery, particulars that I've been trying to obtain, certain information from Baltimore, Maryland with respect to this case. [The prosecuting attorney] from the State's Attorney's office, has assisted me in this and we're still awaiting some evidence, some material from Baltimore that I feel will be relevant to, *based on what my conversations with my client are* ***.

* * *

The problem is getting the information from Maryland.

THE COURT: I don't know what kind of information is it?

[PROSECUTING ATTORNEY]: Judge, the Defendant was arrested on an extradition warrant. I've called.

* * *

The bottom line is Judge on the 26th of August, I called the Baltimore Police, or spoke to Detective Robert Leeman, L-e-e-m-a-n.

THE COURT: Just tell me what he needs.

[PROSECUTING ATTORNEY]: I don't know what he is requesting. We're requesting everything they had.

* * *

[BARNES' ATTORNEY]: Yes, your Honor, I have talked to my client. I've done my preliminary research. I'm waiting to get the information from Maryland so I can prepare the motion appropriately ***. I can prepare a motion and withdraw that once I get the information.

THE COURT: Counsel, the County of Cook pays out large sums of tax payers' money for the State's Attorney as well as the Public Defender. They go out as well as you can.

[BARNES' ATTORNEY]: I'll ask them to send me to Baltimore.

THE COURT: [T]he State can help find it. Have you talked with them?

[PROSECUTING ATTORNEY]: August 26th, Judge, I made a follow up telephone call to a Detective Robert Leeman L-e-e-m-a-n, who told me that as soon as I hung up the phone he was

going to put his file or a copy therefore in the mail to me so I should be getting it by the end of the week.

THE COURT: Let's put this over one week for status."

██ It is clear from the foregoing that as of August 31, 1982, the prosecutor had not received a transcript of Barnes' Maryland extradition proceedings. The record does not reveal whether the prosecutor knew that during Barnes' Maryland extradition proceedings he had testified that he was in Baltimore, Maryland, when Terrell Jackson was robbed and murdered in Chicago on August 2, 1981.

The record before us reflects that Barnes' attorney did not, after the August 31, 1982, courtroom proceedings or during subsequent pretrial proceedings, further pursue his production and disclosure demand and that he did not make any subsequent requests for the transcript of the Barnes' Maryland extradition proceedings. Although the aforementioned supreme court discovery rules imposed on the prosecutor a continuing obligation to furnish Barnes' attorney the requested discovery material, it does not appear that that duty was disregarded or violated by the prosecutor's failure to have done so.

On April 28, 1983, one day before trial, the prosecutor made a motion to add the name of a Baltimore, Maryland, police officer, who had previously testified on a pretrial motion, to the State's list of trial witnesses. During the ensuing colloquy, the prosecutor stated:

"I tendered the police reports previously with the officer's name on it. It is a Baltimore, Maryland report *** those reports were tendered several months ago of Officer Ozazewski, he was the arresting officer ***.

\* \* \*

The reports were tendered, and counsel, if he lost them, he lost the, but every report from the Maryland Police Department was tendered ***.

[BARNES' ATTORNEY]: If the State is saying the report she first showed me is the only one they have—

[PROSECUTING ATTORNEY]: That is all I have.

[BARNES' ATTORNEY]: They can make a copy and give it to me.

\* \* \*

[PROSECUTING ATTORNEY]: I could get it to him tomorrow."

Subsequent courtroom colloquy (hereafter set forth), clearly establishes that Barnes' attorney acquired the transcript of the Barnes Baltimore, Maryland, extradition proceedings.

At trial Barnes presented the alibi testimony of Margaret Jones,

who testified that she was the wife of Joseph Barnes, that on August 2, 1981, she lived with Barnes and her two children at 3939 South Lake Park, that at 5 p.m. on that date Joseph Barnes was home with her and her children, at which time her girl friend, Theresa Wilkins, called her on the telephone, that Barnes answered the call, and that Barnes never left the home that afternoon or evening. Margaret Jones further related that Barnes' mother, stepfather and sister lived in Baltimore, Maryland, and that Barnes went to Baltimore the last of August 1981 to do construction work with his stepfather.

Barnes next called Theresa Wilkins as another alibi witness. Wilkins testified that she called Margaret Jones' home in Chicago about 4:30 p.m. on August 2, 1981, and the defendant, Joseph Barnes, whose voice she recognized, answered the telephone. Wilkins talked to Jones about why she missed church earlier that day.

Upon the conclusion of Wilkins' testimony, the trial was adjourned to the following day, Friday, April 29, 1983, at which time Barnes' attorney stated that he was "going to rest." At that point the prosecutor informed the court and counsel that the State had one rebuttal witness, Baltimore police detective Joseph Verba, who was coming from Baltimore on Sunday to be available as a witness on Monday morning. Barnes' counsel stated, "Does he have a report? I don't have a report from him." The prosecutor responded, "You have everything that is relevant, yes, you have everything relative to this."

When court later resumed after lunch, Barnes' attorney made an *in limine* motion to bar Detective Verba and his testimony on rebuttal. At no time did Barnes' attorney urge as a ground therefor that he had not been furnished a transcript of Barnes' Baltimore extradition proceedings. Barnes' attorney exclusively argued:

> "Judge, what they are trying to do with this witness is *** to present to the jury the fact that my client fought being extradited back to Illinois from Maryland and prejudice the jury. Any probative value what he has to say is, clearly, outweighed by prejudice of presenting to this jury that my client fought extradition from Baltimore to Illinois. And I move *in limine*, to prevent the testimony of an extradition hearing."

And, further:

> "They are not attempting to rebut witnesses who testified. They are attempting to rebut witnesses who have not testified here in court at all."

The trial court denied Barnes' *in limine* motion and adjourned the trial proceedings to Monday, May 2, 1983, on which date Barnes' attorney did not expand his objection to Detective Verba's testimony to

include that he had not been furnished the transcript of Barnes' Maryland extradition proceedings.

On Monday, May 2, 1982, Baltimore, Maryland, police detective Joseph Verba testified that he was present on January 5, 1982, about 10 a.m., during the Baltimore court proceeding in which the defendant Joseph Barnes testified; that the proceedings were before and in Judge Maria Ravbran's court; Mr. Paul, Barnes' attorney, Detective Elliott, Verba's partner, and Jacqueline Stovich, the official court reporter who recorded the proceedings, were present. Verba related that the court reporter transcribed the proceedings, which Verba identified as People's exhibit No. 22, and testified that the transcription was a true and accurate copy of the proceedings that occurred. The prosecutor unsuccessfully sought to have the transcript admitted into evidence and Barnes' testimony therein published to the jury. Thereupon, the following revealing colloquy occurred:

"[BARNES' ATTORNEY]: Your Honor, I, again, ask that the State be required to make a formal offer of proof by asking questions and soliciting answers of this witness [Joseph Verba] as to what exactly his testimony would be—

THE COURT: *** *Have you read the transcript?*

[BARNES ATTORNEY]: *Yes Judge. I am the person who ordered the transcript and gave everybody copies. I have the original."* (Emphasis added.)

It is undeniably clear from the foregoing that Barnes' attorney had acquired a transcript of the Barnes Baltimore extradition proceedings. The trial court therefore correctly allowed Detective Verba to testify that on January 5, 1982, in the Baltimore city court, the defendant, Joseph Barnes, was asked whether he was in Chicago, Illinois, on August 2, 1981, and Barnes, under oath, stated that he was not in Chicago, Illinois, on that date, but that he was in Baltimore from the end of July 1981 until he was arrested in Baltimore by the Baltimore police department, which was on September 14, 1981.

We note with significance that the record before us does not anywhere reflect that Barnes or his attorney claimed surprise by Barnes' aforementioned Baltimore extradition proceeding statements. We further note, again with even greater significance, that Barnes never contested, refuted or denied the extradition proceeding statements attributed to him by Baltimore detective Joseph Verba. The record before us affirmatively establishes that: (1) Barnes' attorney never objected to Detective Verba's testimony of Barnes' statements during his Baltimore extradition proceedings on the ground that he had not been furnished with a transcript of the extradition proceedings; and

(2) Barnes' attorney had acquired a transcript of the extradition proceedings. Barnes' objections to the admission of Detective Verba's testimony of Barnes' January 5, 1982, sworn testimonial court statement that he was in Baltimore, Maryland, on August 2, 1981, to rebut the contrary testimony of his alibi witnesses, Margaret Jones and Theresa Wilkins, on the ground that the State had not furnished him a transcript of the extradition proceedings pursuant to the hereinbefore mentioned discovery rules and court orders and the State's obligation thereunder, are totally without merit.

 As previously noted, Barnes' attorney objected to the State's introduction of Barnes' January 5, 1982, Baltimore extradition proceeding statement that he was in Baltimore on August 2, 1981, on the ground that his statement, although it would have been proper and admissible to impeach the defendant's contrary trial testimony, it was inadmissible inasmuch as Barnes did not testify at his trial. Barnes' attorney further argued that Barnes' prior Baltimore statement was inadmissible and improper to rebut the contrary trial testimony of his two alibi witnesses, Margaret Jones and Theresa Wilkins.

Recently, the supreme court in *People v. James* (1988), 123 Ill. 2d 523, upheld the admission of a defendant's pretrial statement to rebut the contrary direct trial testimony of the defendant's defense witnesses. In *James*, five trial witnesses identified the defendant James as the person they saw shoot and kill one victim and injure another. Each State witness testified that at the time of the shooting the defendant had shoulder length, slicked-back, butter-style reddish hair. At trial, the defendant's hair was black and in a natural style.

The defendant James did not testify at trial. The defendant's principal trial witness, a family friend, testified that on the day of the shooting she had taken the defendant to register for high school, and at that time the defendant's hair was black. To rebut this defense witness' testimony, the State sought to introduce the defendant's contradictory but previously suppressed statement.

James had been arrested the day after the shooting while sitting under a hair dryer in his mother's beauty shop. While in police custody he told the officers that on the previous day, the day of the shooting, his hair was long and combed straight and was reddish in color and that on the following day, the day of his arrest, he had gone to his mother's beauty parlor to have his hair dyed and curled to change his appearance. The defendant's statement was suppressed at a pretrial hearing upon the trial court's finding that the officers lacked probable cause to arrest James. After another hearing on the voluntariness of James' statement, the trial court found that James

had freely given the previously suppressed statement, and over the defendant's objection, allowed the State to introduce the defendant's statement, to rebut James' defense witness' testimony that James' hair was black on the date of the offense. The defendant contended that his previously suppressed statement was inadmissible and improper rebuttal of his defense witness' testimony.

The jury found the defendant guilty. The appellate court reversed. (*People v. James* (1987), 153 Ill. App. 3d 131, 505 N.E.2d 1118.) The supreme court granted the State's petition for leave to appeal, reversed the appellate court, affirmed the trial court and held:

"The defendant argued, however, that *Walker, Harris, Hass* and *Havens*[5] are distinguishable from this case in one decisive respect: in all those cases the defendant himself testified, and it was his own testimony which was impeached by admission of the previously suppressed evidence. According to this view, when a defendant elects to take the stand and testify in a manner inconsistent with suppressed evidence, he thereby 'waives' his right to have the impeaching material excluded. Thus, the argument runs, if the defendant does not testify no such 'waiver' occurs and the evidence must remain excluded, even if other defense witnesses testify falsely.

We do not accept those contentions. * * *

* * * [A] defendant may not directly perjure himself and then hide behind the exclusionary rule[;] he also cannot be allowed to use perjurious testimony through a biased defense witness, in this case the principal defense witness, without affording the prosecution an opportunity to challenge the veracity of that testimony. We therefore conclude that admission of the evidence was not inconsistent with the reasoning of the cases discussed above.

* * * [T]his exception to the exclusionary rule is limited to * * * rebut statements made by a defense witness on direct examination and not to rebut statements elicited on cross-examination * * *. * * *

The statement of the witness sought to be rebutted by the suppressed evidence must not be elicited through cross-examination by the prosecutor, but must be an assertion by a defense

---

[5]*Walden v. United States* (1954), 347 U.S. 62, 98 L. Ed. 503, 74 S. Ct. 354; *Harris v. New York* (1971), 401 U.S. 222, 28 L. Ed. 2d 1, 91 S. Ct. 643; *Oregon v. Hass* (1975), 420 U.S. 714, 43 L. Ed. 2d 570, 95 S. Ct. 1215; *United States v. Havens* (1980), 446 U.S. 620, 64 L. Ed. 2d 559, 100 S. Ct. 1912.

witness elicited on direct examination which is directly contrary to an assertion made by the defendant in the suppressed statements. The difference between the assertion by the defense witness and that contained in the suppressed statement must be more than a mere inconsistency. The difference must amount to a contradiction to the extent that the statement of the witness cannot be true when measured against the suppressed statement of the defendant. Also, it must be apparent that the untrue statement of the witness, as so measured, has been purposefully presented by the defendant \*\*\*. \*\*\*
\*\*\*

\*\*\* [W]e hold that when a defense witness testifies on direct examination in a manner squarely at odds with evidence which has been suppressed, that evidence may be introduced to challenge the veracity of the testimony. \*\*\* [O]nly statements made on *direct* examination may be impeached and there must be a direct, material relationship between the trial testimony and the impeaching evidence. \*\*\* Although the use of prior inconsistent statements for impeachment is ordinarily considered in connection with prior statements by the witness sought to be impeached, impeachment may also be accomplished by the use of a prior contradictory statement by another." (Emphasis in original.) *People v. James* (1988), 123 Ill. 2d 523, 535-38.

The three dissenting justices in *James* predicated their dissent in part on the ground that the defendant's statement had been previously suppressed because it was obtained as a result of his illegal arrest without probable cause and that to allow its introduction into evidence to rebut a defense witness' testimony, not the defendant's, would circumvent and ultimately erode the exclusionary rule. In the instant case, however, this legitimate constitutional law concern is not present, for the defendant Barnes' statement in the case at bar was not suppressed for having been illegally obtained in violation of the defendant's constitutional right to be secure in his person against unreasonable search and seizure. Indeed, in the case at bar the defendant Barnes' statement, conversely, was freely and voluntarily given, under oath, in a judicial proceeding, pursuant to his constitutional right to be a witness in his own behalf. Thus, the dissent's objection in *James* to the admission of the defendant's constitutionally illegally obtained and suppressed statement is significantly absent in the instant case.

We find no merit in and we reject Barnes' contention that "the State failed to comply with its duty to disclose \*\*\* the existence and

substance of \*\*\* statements made by Barnes" at his extradition proceedings which were admitted into evidence to rebut Barnes' alibi defense.

### IV

■■■ The defendants next argue that the cumulative effect of what the defendants describe as the prosecutor's misconduct (1) in disparaging defense counsel; (2) misrepresenting that Barnes' alibi defense was fabricated; and (3) denigrating the reasonable doubt standard denied defendants due process of law.

We do not condone prosecutorial misconduct and we have consistently and adamantly condemned it. (*People v. Starks* (1983), 116 Ill. App. 3d 384, 451 N.E.2d 1298; *People v. Piscotti* (1985), 136 Ill. App. 3d 420, 444-54, 483 N.E.2d 363; *People v. Clark* (1983), 114 Ill. App. 3d 252, 448 N.E.2d 926; *People v. Brown* (1983), 113 Ill. App. 3d 625, 447 N.E.2d 1011.) The prosecutor's responsibility and duties are of the highest calling in government and public service. He is the chosen attorney for the People, and his professional and personal conduct, in and out of the courtroom, must be at all times impeccable, of the highest caliber and above and beyond reproach. He is commanded to prosecute vigorously but fairly, never deliberately or purposefully violating the rules or the rights of the accused. Regardless of the verdict the prosecutor never loses, but he always wins when he properly conducts himself in absolute compliance with these foregoing principles.

In this somewhat protracted, highly contested armed robbery, murder death-penalty trial, which extended before the jury from April 18, 1983, through May 3, 1983, and consisting of over 2,460 transcript pages in four volumes, the defendants complain of the following alleged prosecutorial misconduct. During the prosecutor's redirect examination of the State witness, Arlander Adamson:

"Q. Had you testified before as a witness?

A. No.

Q. *Had you ever had a smart lawyer get up and ask you thirty questions?*

[DEFENSE ATTORNEY]: Objection.

THE COURT: *Sustained, and counsel, you're admonished.*" (Emphasis added.)

The prosecutor stated during closing argument to the jury:

"What is their [Arlander Adamson or Gwen Thomas'] motivation? Is it just simply well, let us just put it on somebody? Of course not. They want the persons responsible to be held to the responsibility. That is why they testified. And *counsel makes it*

*a case of mistaken identity, or who done it. That is fine. That is their job.* But that is not what the facts are." (Emphasis added.)

It was improper for the prosecutor to attribute the defendants' defense of mistaken identity to defense counsel and/or argue that it was defense counsel's job to do so. Defense counsel did not object. Even in the absence of a timely objection from defense counsel, we again clearly admonish prosecutors to cease and desist from remarks which tend to denigrate the role of the defense attorney in upholding his sworn duty to his client and the profession. Such unwarranted remarks do not aid the jury in fulfilling their responsibility of arriving at a just verdict on the evidence and such despicable comments can only cause the necessary invalidation of an otherwise valid verdict.

At another point in the prosecutor's closing argument, he improperly complained:

"How they got into that house that day, it doesn't make any difference \*\*\*. *It is another issue thrown in front of you to confuse you. It is their job to present any issues that they can find, and they have done that.*

[COLEMAN'S ATTORNEY]: *Objection.*

THE COURT: *Sustained.*" (Emphasis added.)

Defense counsel's objections were also sustained to the final acts of prosecutorial closing argument alleged misconduct, of which the defendants complain:

"My job, [my partner's] job in this case was to present evidence to you, proof beyond a reasonable doubt. That is our job, today, yesterday, tomorrow, every day. We have the same job in every case that comes in this courtroom. It doesn't change. It is always the same burden, proof beyond a reasonable doubt. Whether it is a theft, an armed robbery, or murder, we have that job every day, and that job and that burden is met every day in this building, in this country, in this State.

[COLEMAN'S ATTORNEY]: *Objection.*

THE COURT: *Sustained.*

[PROSECUTING ATTORNEY]: That is burden of proof in criminal trials that—

[COLEMAN'S ATTORNEY]: *Judge, the objection is sustained.*

THE COURT: *The objection is sustained.*

[PROSECUTING ATTORNEY]: I welcome that burden \*\*\*." (Emphasis added.)

Although the complained-of prosecutorial comments certainly

would have best gone unsaid, in those instances where objections were made, the trial court ruled firmly, swiftly and correctly. From the totality of the comments and the trial court's rulings, we do not find that reversible error occurred. *People v. Bryant* (1983), 94 Ill. 2d 514, 447 N.E.2d 301; *People v. Green* (1983), 118 Ill. App. 3d 227, 454 N.E.2d 792.

## V

The defendants' final contention is that the trial court failed to properly exercise its discretion when it summarily denied during their deliberation the jury's request for a transcript of a witness' testimony, solely on the ground that the witness' testimony had not been transcribed. To accurately assess this contention, a review of the trial chronology is helpful.

The record reveals that the selection of the jury began on April 18, 1983, and proceeded through April 19, 20, 21, 22, and 25 and on April 26, the jury was sworn. The entire period, however, was not devoted exclusively to jury selection, for the trial court performed other judicial business relative to the case during the period. Opening statements to the jury were made by all the parties on April 26. Upon the conclusion of the opening statements, the State called as its first witness Arlander Adamson. Adamson related, as previously pointed, that he witnessed the two defendants on August 2, 1981, about 5 p.m., enter the home at 6856 South Calumet, rob, shoot and kill Terrell Jackson. Adamson was immediately cross-examined by Coleman's attorney, followed by Barnes' attorney and redirect examination by the prosecutor, and Coleman's attorney finally re-cross-examined Adamson. The next witness called by the State was Gwen Thomas, also an eyewitness to the robbery-murder who identified the defendants as the offenders. Upon conclusion of Thomas' direct and cross-examinations, the trial was postponed to the following day, Wednesday, April 27, 1983. The jury heard five additional, rather brief witnesses presented by and on behalf of the State on April 27 and on the morning of April 28, and at 12:10 p.m., the State rested.

The trial resumed at 1:30 p.m., at which time the defendant Coleman called a witness in his behalf. The defendants thereafter called two Chicago police officers as brief witnesses to finalize impeachment of the State's witnesses on certain aspects of their descriptions of the robbery-murder offenders. Barnes then called Margaret Jones and Theresa Wilkins, who testified to Barnes' alibi defense. Thereupon, the defendants rested. The trial proceedings were postponed to the following day, Friday, April 29, 1983, and on that date the proceed-

ings were adjourned to Monday, May 2, 1983, so that the prosecutor could bring in its rebuttal witness, Baltimore police detective Joseph Verba. Verba testified on the morning of Monday, May 2. During the remainder of the day, the court held the instruction conference, closing arguments were presented, and the court instructed the jury. The record reflects that the jury departed the courtroom for dinner at 6:07 p.m., and returned to the jury room for deliberation at 7 p.m.

The record further reveals that at about 7:38 p.m., the trial court stated:

> "It is 7:38 p.m. I have received on a yellow piece of paper about 10 minutes or so ago, a copy of a note from the jurors [which reads]:
>
> 'Are we entitled to see a copy of the trial transcript?' "

The trial court inquired and the prosecutors and defense attorneys responded that neither had any trial transcripts. The trial court stated that it had a transcript of the testimony of defense witness Dorothy Davis, which had been ordered by the trial court to aid it in ruling on the State's motion to strike her testimony on the grounds of relevancy. Coleman's attorney and one of the prosecuting attorneys stated to the trial court that they thought it would be inappropriate to give the jury a transcript of Davis' testimony simply because it was available. Coleman's attorney and a prosecutor argued that the trial judge should respond to the jury's question by the trial judge simply advising the jury to continue deliberation. The trial judge wrote and submitted his following response to the jury's question:

> "ANSWER: What transcript do you have in mind?
> 5-2-83 /S/J/ Palmer
> 7:44 P.M."

After a brief pause the jury responded in writing as follows:

> "Direct and cross-examination of Arlander on Tuesday."

The trial court stated to counsel that, "The answer to them will be, that we don't have the transcript. Kindly continue with your deliberation. That is all." Thereupon, the following colloquy occurred:

> "[COLEMAN'S ATTORNEY]: Then you should put down *** the transcript of his testimony is not available, which is what they asked for.
>
> THE COURT: This transcript is not available. Kindly continue with your deliberation. Fine. Is that satisfactory?
>
> [PROSECUTING ATTORNEY]: Yes.
>
> [COLEMAN'S ATTORNEY]: My suggestion was to say that the transcript of his testimony is not available.
>
> [BARNES' ATTORNEY]: I suggest that we get the court

reporter to type it up."

The trial court then submitted to the jury his following handwritten response:

> "This transcript is not available, kindly continue with your deliberation /S/ J. Palmer 8:04 p.m."

At no time did either defense counsel object to the foregoing method or responses of the trial court to the jury's inquiries. Neither defense counsel requested the trial court to exercise its discretion differently than it was exercised or objected to the method in which it was exercised. The trial court solicited counsel's suggestions, and they acquiesced in the trial court's proffered solution.

The jury deliberated until 9:50 p.m., at which time they were called into the courtroom and, pursuant to the trial court's inquiry, stated that they had not reached a verdict. The jury discontinued their deliberation, they were sequestered the remainder of the night, and they resumed deliberation and returned their guilty verdicts the following day, Tuesday, May 3, 1983. During the entire period that the case was before the jury for deliberation, neither defense counsel ever complained to the trial court about the manner in which the trial court exercised its discretion in response to the jury's requests for the transcript of Arlander Adamson's testimony.

A trial court's compliance with a jury's request during deliberation for a transcript of a trial witness' testimony is discretionary, and the exercise of that discretion will be accepted on review absent a showing of abuse.

In *People v. Pierce* (1974), 56 Ill. 2d 361, during deliberation the jury asked the trial judge what was the testimony of the prosecuting witness, a rape, robbery and kidnap victim, and the arresting officer. The trial judge responded in writing, " 'I cannot instruct further. You must continue with your deliberations.' " (56 Ill. 2d at 363.) The defendant was convicted, and he assigned as error for reversal the trial court's refusal of the jury's request for a review of the trial witness' testimony. The supreme court held:

> "[T]here are differing views on whether a trial judge upon a jury's request during its deliberations should permit a review of testimony that was presented during trial. Some have taken the position that where the requested testimony is directly material to the issues in the case the trial court must grant the jury's request. (*E.g., United States v. Jackson* (3d Cir.), 257 F.2d 41.) The view taken in the ABA Standards, Trial by Jury, section 5.2 (Approved Draft, 1968), is that the trial court is obliged to have the testimony read to the jury whenever the ju-

ry's request is reasonable, the determination of which, of course, involves an exercise of discretion. A third view is that it is within the discretion of the trial court to allow or refuse the request for the review of testimony. The majority of courts which have considered the question have adopted this view. (50 A.L.R.2d 176.) We consider that the position of the majority is to be preferred. The trial court will have a full knowledge of the case. It will know the charges against the accused, the witnesses and their supporting or defeating testimony and other evidence which may have been presented. It will be in a position to assess the request and judge whether a review of testimony, considering the circumstances, will be helpful or hurtful to the jury's proper deliberations. This question of review, like so many others which appear in the course of trial, is best entrusted to the trial court's sound discretion.

A decision within the trial court's discretion will not be disturbed on appeal unless there has been an abuse of discretion." 56 Ill. 2d at 363-64.

In *People v. Queen* (1974), 56 Ill. 2d 560, 565, while the jury was deliberating, the foreman sent a note to the trial court which read, "Would like the defendant's words on the stand." The trial court responded in writing, "You must decide on the basis of the testimony heard in the courtroom. I cannot have any testimony of any witnesses read to you." (56 Ill. 2d at 565.) The defendant argued on review that the jury's request was addressed to the trial court's discretion and that the trial court erroneously refused to exercise this discretion. The supreme court agreed, and in reversing and remanding for a new trial, stated:

"In *People v. Pierce*, 56 Ill. 2d 361, we adopted the view that it is within the trial court's discretion to allow or refuse a jury's request for a review of testimony. We consider that the reply of the trial court to the jury must be interpreted as a statement that it did not have discretion to consider the jury's request for a review of the defendant's testimony. There is error when a trial court refuses to exercise discretion in the erroneous belief that it has no discretion as to the question presented. (*People ex rel. Chesapeake and Ohio Ry. Co. v. Donovan*, 30 Ill. 2d 178.) Considering the circumstances here, we judge that the error was of such substance that the cause must be remanded for a new trial. The jury's decision as to the defendant's credibility was a critical factor. We do not know what prompted the request for review, but we judge that the

defendant was entitled to have the request considered by the trial court.

It is true that the trial court's reply here resembled the reply given the jury by the trial judge in *People v. Pierce*, where we considered that the judge did exercise discretion. However, we believe that the language here must be distinguished. The court's advising the jury here in its reply that it must decide on the basis of the testimony already heard, followed by the statement that 'I cannot have any testimony of any witnesses read to you,' convinces us it was a declaration that the court was without discretion." 56 Ill. 2d at 565-66.

In exercising that discretion, the trial court begins with the assumption that the jury believes that their review of the requested testimony will be helpful in their deliberation and in arriving at a correct verdict. The trial court then determines if there is a basis for the jury's belief that such a review would be beneficial and the possible harm the proposed review would have on their deliberations. *People v. Martin* (1980), 84 Ill. App. 3d 822, 826, 406 N.E.2d 49.

Defendants convincingly argue that the trial court's denial of the jury's request for a transcript of Adamson's testimony simply and solely on the ground that the testimony had not been transcribed, without considering the many other pertinent factors, demonstrates that the trial court did not properly exercise its discretion. The defendants persuasively contend that the trial court was uninfluenced by any possible detrimental delay which would result from ordering the court reporter to transcribe Adamson's testimony compared to the transcript's benefit to the jury and that the trial court made no determination regarding any such delay. The defendants further urge that the trial court did not consider the alternative of the court reporter reading Adamson's testimony to the jury, thereby reducing the delay while simultaneously allowing the jury a review of the requested testimony.

Whether a witness' trial testimony has been transcribed when the jury requests it during deliberation is only one of many factors the trial court should consider in resolving the jury's request and exercising its discretion. Even when the requested testimony has been transcribed, it is not thereby automatically available to the jury upon their request. There is the view that where the testimony has been transcribed, it should not be sent to the jury room during deliberations for the jury to review and debate, without judicial supervision, over its contents, dependent upon the individual juror's literary and oratorical skills, rather than discussing and evaluating the witness and the wit-

ness' testimony as the witness appeared before the jury when testifying. This view supports bringing the jury into the courtroom under the trial court's supervision and, with all the parties present in a trial atmosphere, having the court reporter read to the jury the requested testimony. This course assures an accurate, complete and impartial recitation of the requested testimony, which cannot be assured when the transcript is submitted to the jury. On the other hand, whether the jury requests a small portion or the complete transcript of a witness' testimony must be considered in the exercise of the court's discretion. Likewise, (1) the nature of the case; (2) the significance of the witness' testimony to the prosecutor's case or to the defendant's defense; (3) the issues of the case; (4) the chronology of the witnesses' trial appearances, the nature and length of the witnesses' testimony; (5) the number of witnesses who have testified; (6) the length of the trial; (7) the period of time that the jury has deliberated; (8) the availability of the court reporter; and (9) the attorneys' position in support of or in objection to the request, are but some, but by no means all, of the factors the trial court should consider in determining how to exercise its discretion in response to a jury's request for a transcript of a trial witness' testimony. Trial counsel are charged with the duty of aiding the trial court in exercising this discretion, and their performances in this regard, as well as the trial court's, should be clearly set forth in the record. In this way, the trial court will more likely properly exercise its discretion, and it can be more readily and accurately determined from the trial record that the trial court has done so.

In the case at bar, the defendants were charged with the grave offenses of armed robbery and murder, after invading the sanctuary of and in the deceased's home. The State was seeking the extreme penalty—death. The defense was mistaken identity and alibi. The issues were relatively simple and the trial was not unduly lengthy, protracted or complicated. The number of witnesses was relatively small. It is clear that the jury's request for a transcript of Adamson's testimony was simply to aid the jury in accurately resolving the awesome responsibilities confronting them. Although it may have been proper for the trial court to have informed the jury that the testimony of Adamson's testimony had not been transcribed, as the trial court did, the trial court's summary denial of the jury's request for a transcript of Adamson's testimony simply because and on the sole ground that it was unavailable was an abuse of the trial court's discretion, but in which, as pointed out, the defense attorneys clearly acquiesced. Thus, they cannot now complain. *People v. Matthews* (1974), 21 Ill. App. 3d 249, 252, 314 N.E.2d 15; *People v.*

*Virgin* (1973), 9 Ill. App. 3d 902, 905, 293 N.E.2d 349.

We have meticulously scrutinized the trial record in the case at bar. The trial court painstakingly displayed impeccable fairness, complimentary judicial temperament and unyielding patience. He manifested a diligent and sincere concern for and scrupulously protected the rights of each defendant. The offenses were egregious and the sentences of life imprisonment, although severe, were certainly appropriate. The defendants received a fair trial and no error occurred during their trial which warrants a reversal of their convictions. Accordingly, the defendants' judgments of conviction are affirmed.

Affirmed.

LORENZ and COCCIA,* JJ., concur.

## APPENDIX I

### DEFENDANT MAURICE COLEMAN'S
### "MOTION TO SUPPRESS IDENTIFICATION TESTIMONY

Now comes the defendant and his attorney, and moves this Honorable Court to enter an order suppressing certain identification testimony of witnesses that the State has indicated will be called to testify against him. In support of said motion, the defendant states as follows:

1. That he was arrested on August 19, 1981 at 6458 S. Eberhart, Chicago, Illinois at 1445 hours.

2. That certain of the witnesses were improperly shown photographs of the accused in that:

a. Said photographic identification and/or showup took place at a time when the accused was in the custody of government officials and a proper witness-suspect confrontation was possible;

b. The composition and construction of the photographic display was such as to improperly suggest the identification of the accused as the perpetrator of the offense i.e., the disparity in age, height, weight, dress, complexion and other distinguishing characteristics were improperly conducive to the identification of the accused;

c. That the conduct of the police was such as to improperly suggest the identification of the accused as the perpetrator of the offense;

d. That the conduct of bystanders and others present was such as to improperly suggest the identification of the accused as the perpetrator of the offense;

---

*Justice Sullivan having retired, Justice Coccia was substituted in his place and, having considered the briefs, concurs.

e. That various witnesses were allowed to be simultaneously present at the witness-suspect confrontation and were allowed to make their identification of the accused in each others presence or were allowed to discuss amongst themselves their identification of the accused during the identification process;

f. That prior to said confrontation the accused was not advised by the police that he had a right to have an attorney present during such confrontation.

5. That the actions of the police were unnecessary under the facts and circumstances of this case and that for the reasons stated and as will be developed at the hearing on this motion, these actions were necessarily conducive to irreparable mistaken identification.

WHEREFORE, defendant prays that this Court suppress:

a. Any reference to the pre-trial investigation of the accused such witnesses as were involved in the improper pre-trial identification;

b. The in-court identification of the accused by such witnesses as are involved in the improper pre-trial identification inasmuch as such identification is the product of the improper pre-trial identification unless the State shows by clear and convincing evidence that the in-court identification is not tainted and fully independent of the pre-trial identification."

## APPENDIX II

### DEFENDANT JOSEPH BARNES'
#### "MOTION TO SUPPRESS IDENTIFICATION TESTIMONY

Now comes the defendant and his attorney *** and moves this Honorable Court to enter an order suppressing certain identification testimony of witnesses that the State has indicated will be called to testify against him. In support of said motion the defendant states as follows:

1. That he was arrested on September 14, 1981 at Baltimore, Maryland.

2. That on August 28, 1981 Given Thomas [sic] and Arlander Adamson were shown an unspecified number of photographs of an unspecified nature and quality, one of which was a photograph of Joseph Barnes. Both noted that Barnes resembled a wanted offender, but each wished to see a lineup.

3. The composition and construction of the above mentioned photographs display and/or lineup was such as to improperly suggest the identification of the accused as the perpetrator of the offense, i.e., the disparity in age, height, weight, as well as the inadequate number of

subjects presented for comparison was improperly conducive to the misidentification of the accused.

4. That the conduct of the police and/or other governmental officials at the photo showup was such as to improperly suggest the identification of the accused as the perpetrator of the offense.

5. On February 17, 1982 Joseph Barnes stood in a five man lineup.

6. Prior to said confrontation the accused was not advised by the police that he had a right to have an attorney present during such confrontation.

7. Defendant's appearance in and the construction of the above-mentioned lineups unduly prejudiced defendant and induced the above-mentioned witnesses to select defendant as the wanted offender.

8. That the action of the police was unnecessary under the facts and circumstances of this case and that for the reasons stated and as will be developed at the hearing on this motion, these actions were unnecessarily conducive to mistaken identification.

WHEREFORE, defendant prays that this Court suppress:

(a) Any reference to the pre-trial identification of the accused by such witnesses who were involved in the improper pre-trial identification;

(b) The in-court identification of the accused by such witnesses as were involved in the improper pre-trial identification inasmuch as such identification is the product of the improper pre-trial identification unless the State shows by clear and convincing evidence that the in-court identification is not tainted [*sic*] and is fully independent of improper pretrial identification procedures."

## APPENDIX III

### DEFENDANT MAURICE COLEMAN'S MOTION FOR A NEW TRIAL

"Now comes the Defendant MAURICE COLEMAN by his Attorney *** after a verdict of guilty and before sentence and respectfully moves this Honorable Court to set aside the verdict of guilty in the above entitled cause and grant him a new trial, it being expressly understood that defense counsel has not yet been furnished with an official transcript of the trial and makes this motion on behalf of his client, without prejudice to or waiving the later discovery of error in the trial record.

In support whereof, Defendant states:

1. The State failed to prove the Defendant guilty of the charge beyond all reasonable doubt.

2. The verdict is against the weight of the evidence.

3. The Defendant was denied due process of law.

4. The Defendant was denied equal protection of the laws.

5. The State failed to prove every material allegation of the indictment beyond a reasonable doubt.

6. The Defendant did not receive a fair and impartial trial as guaranteed him under Article I, Sections 2, 6, 8 and 10 of the Constitution of the State of Illinois and under the Fourteenth Amendment of the Constitution of the United States.

7. The Court erred in overruling the Defendant's motion for a directed verdict at the close of the State's case.

8. The Assistant State's Attorneys made prejudicial inflammatory and erroneous statements in closing argument designed to arouse the prejudices and passions of the jury prejudicing the Defendant's right to a fair trial.

9. The Court erred in denying the Motion to Suppress Identification.

10. The Court erred in denying any and all other pre-trial motions, including Motions *in limine*.

11. The Court erred in denying defense counsel an *in camera* hearing on the question of severance.

12. The Court erred in denying defense counsel an offer of proof outside the presence of the State.

13. The Court erred in not granting a mistrial based on jury selection.

14. The Court erred in denying the motion to exclude entire venire as not representative of community.

15. The Court erred in denying motion for mistrial based on failure to disclose Brady material, to-wit: Statement of co-defendant.

16. The Court erred in denying Defendant an opportunity to file severance based on the above statement.

17. The Court erred by having an *in camera* hearing with the State outside of presence of Defendant.

18. The Court erred in allowing hearsay testimony in over Defendant's objection.

19. The Court erred in not informing defense counsel of the problem with a juror, to-wit: the death in her family.

20. The Court erred in allowing her, the jury [*sic*], contact with the outside during deliberations.

21. The Court erred in not informing counsel of the fact that the juror was then aware of the problem with the death of her mother.

22. That it is reasonable to infer under the facts and circum-

stances that the news of the death of her mother coming after an evening of deliberations and before being sequestered for the night, caused the juror's will to be overborne by the outside influence and a mistrial should have been granted.

WHEREFORE, for the various reasons urged before and during the trial and every error as may appear from the official transcript of proceedings of the trial, Defendant requests a new trial in the above cause."

## APPENDIX IV

### DEFENDANT JOSEPH BARNES' MOTION FOR A NEW TRIAL

"Now comes defendant by his attorney and moves this Honorable Court for a new trial.

In support of this motion defendant states:

A. He was found guilty after a jury trial.

B. He was denied a fair and impartial trial for the following reasons:

1. Trial court denied his motions for a separate trial:

(a) He was refused an in camera hearing on the issue. This hearing was necessary because a witness to be called by the co-defendant was prejudicial to defendant and created a grave conflict. Co-defendant was placed in a position of not being able to call this witness.

(b) After jury selection the State revealed for the first time a statement by co-defendant that revealed a real antagonism in the two defenses.

2. Trial court denied his motion to quash his arrest in that the arresting officers had no probable cause and used illegal force and entry to execute the arrest.

3. Trial court denied his motion to suppress identification evidence where defendant's lineup took place 6 months after the offense and the lineup was suggestive.

4. Trial court unduly restricted examination of the witnesses on both the motion in point 2 and the motion in point 3.

5. Trial court refused to grant mistrial when juror contaminated fellow jurors by comments as to why she did not want to serve and at least one of the fellow jurors admitted contamination.

6. Defendant was denied Eighth and Fourteenth Amendments and right to fair jury trial when panel of 79 people contained but 8 blacks.

7. Defendant was denied a fair trial when 6 of those 8 were ex-

cluded, leaving only two for possible acceptance.

8. Defendant was denied a fair trial when the State excused one of those two.

9. Trial court refused defendant's question concerning whether perspective [sic] jurors so favored the death penalty that they would impose it on any murder case. Thus removing defendant's option as to whether to allow the jury to consider the death penalty issue.

10. Trial court refused to direct the reconstruction of street files and improperly curtailed examination of officers concerning interviews of witnesses, the statements made by these witnesses and the names and addresses of these witnesses.

11. Trial court refused to limit testimony concerning ballistic reports which were not rendered by the State prior to trial or to grant a continuance for investigation.

12. The State improperly excluded Blacks from the jury.

13. The State improperly excluded all jurors who expressed concerns about always imposing the death penalty.

14. Court refused to order new venire when Joseph Taylor stated that his father was robbed and killed and that the culprits ought to get the electric chair.

15. Trial court prejudiced defendant unduly drawing attention to defendant and his failure to testify when it instructed the jury that defense counsel would outline *his* case and by instructing the jury on April 29 in such a manner as to draw attention to defendant's failure to testify.

16. Trial court denied defendant's motion for copies of investigative reports and contents.

17. State deliberately withheld evidence of statements by codefendant.

18. Trial court refused to allow defendant to pose questions for the court to ask a perspective [sic] juror merely because defendant was out of challenges.

19. Trial court would not allow defendant to accept a panel merely because he was out of challenges.

20. Trial court refused to grant defendant additional challenges.

21. Trial court improperly curtailed the examination of Dorothy Davis.

22. Trial court improperly ordered Dorothy Davis' testimony stricken.

23. Trial court improperly reinstated her testimony without ordering her recalled as a witness.

24. Trial court allowed State to introduce evidence of defendant's

arrest in Baltimore and improperly curtailed cross examination as to this.

25. Trial court allowed the State to impeach defendant's defense with evidence from a Maryland extradition hearing.

26. Trial court allowed the State to use defendant's statement from an extradition hearing without determining the voluntariness of the statement.

27. State prejudiced defendant by attempting to introduce transcript from extradition hearing as substantive evidence, forcing defendant to object, and by arguing this "evidence" as substantive evidence.

28. Trial court curtailed defendant's efforts to show that deceased sold drugs from his apartment and that he had visitors all day long for the purpose of buying drugs.

29. State prejudiced defendant by not revealing the contents of street files and of felony review notes and memorandum of interviews with State witnesses.

30. State's closing arguments were false, misleading and deliberately prejudicial.

31. Trial court did not conduct a proper hearing as to the question of whether the death penalty may be imposed.

32. The trial court improperly admitted evidence at the hearing on the death penalty question.

33. The trial court erred in finding defendant eligible for the death penalty.

34. Trial court improperly withheld information from defense that the deliberating juror learned that her mother had died during deliberations.

35. A deliberating juror had improper communications with outside while deliberating; implying that other jurors were improperly contacted during deliberation.

36. Jurors were allowed to improperly mingle with prospective jurors during jury selection.

C. Defendant was not proved guilty beyond a reasonable doubt in light of the conflicting and impeached testimony of the State's witnesses.

WHEREFORE, defendant prays for a new trial.

* * *

37. State did not reveal to defense that a witness would testify that property was taken from her.

38. The conviction for armed robbery of Terrell Jackson cannot stand due to insufficiency of evidence."